No. 23-1346

# In the
# United States Court of Appeals
# for the Eighth Circuit

Viewpoint Neutrality Now!, Evan Smith and Isaac Smith,
Appellants,

v.

Regents of the University of Minnesota, Kendall J. Powell, Chair, Steven A. Sviggum, Vice Chair, Thomas J. Anderson, Richard B. Beeson, Mary A. Davenport, Kao Ly Ilean Her, Michael D. Hsu, Mike O. Kenyanya, Janie S. Mayeron, David J. McMillan, Darrin M. Rosha, Randy R. Simonson, in their respective official capacities or their successors; Joan T.A. Gabel, President of the University of Minnesota, in her respective official capacity or her successor; Maggie Towle, Interim Vice Provost For Student Affairs and Dean of Students, in her respective official capacity or her successor,
Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
DISTRICT COURT NO. 0:20-CV-01055-PJS-JFD

## APPELLANTS' REPLY BRIEF

Erick G. Kaardal, 229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612 341-1074
Email: kaardal@mklaw.com
*Attorneys for the Appellants*

Dated: July 27, 2023

Carrie Ryan Gallia, 0390479
University of Minnesota
Office of the General Counsel
360 McNamara Alumni Center
200 Oak Street SE
Minneapolis, Minnesota 55455
Telephone: 612-624-4100
Email: ryang001@umn.edu
*Attorneys for Appellee*

# Table of Contents

Table of Authorities ................................................................................................ ii

Reply Argument........................................................................................................ 1

Conclusion............................................................................................................... 10

CERTIFICATE OF COMPLIANCE ....................................................................... 12

CERTIFICATE OF SERVICE ................................................................................. 13

# Table of Authorities

Page(s)

**Cases**

*Bd. of Regents of U. of Wisconsin System v. Southworth,*
   529 U.S. 217 (2000) ............................................................................................ 1

*Curry v. Regents of U. of Minnesota,*
   USDC-MN Civ. No. 98-583 (PAM/JGL) (Nov. 9, 2000) ...................................... 1, 3

*Fisher v. U. of Texas at Austin,*
   579 U.S. 365 (2016) ............................................................................................ 8

*Lamb's Chapel v. Center Moriches Union Free School Dist.,*
   508 U.S. 384 (1993) ....................................................................................... 7, 10

*Rosenberger v. Rector and Visitors of U. of Virginia,*
   515 U.S. 819 (1995) ....................................................................................... 7, 10

*Southworth v. Bd. of Regents of U. of Wisconsin System,*
   307 F.3d 566 (7th Cir. 2002) ............................................................................. 10

**Rules**

FED. R. APP. P. 32 (a)(7) ............................................................................................ 12

**Reply Argument**

The University's response brief confirms that student group exclusion is the University's on-going policy. The University's response brief admits that "[t]he record is undisputed that there is no annual application process for the 68% of space dedicated to the cultural centers, all student groups are not invited to apply for the space, and the nine cultural centers who hold the space now do so on a semi-permanent basis." U of M Resp. Br. at 26 citing (R. Doc. 57, at ¶ 13). This exclusionary policy has been essentially in effect at the University for decades. The exclusionary policy continues to exclude all other student groups from the 68% space which is "semi-permanently" dedicated to the incumbent nine student groups. *Id.*

Notably, the University's decision as to which student groups receive 100% of the 68% dedicated space came before the U.S. Supreme Court's 2000 decision in *Bd. of Regents of U. of Wisconsin System v. Southworth,* 529 U.S. 217 (2000). The University's decision also came before the District Court's decision in *Curry v. Regents of U. of Minnesota.* R. Doc. 1-1, at 1–3 (Ex. A, Memo. and Or., Civ. No. 98-583 (PAM/JGL) Nov. 9, 2000)). The District Court's 2000 decision in *Curry* essentially gave the University a reprieve to study the purported unconstitutionality of its exclusionary policy.

Meanwhile, the University's 2001 Student Fees Task Force, very much aware of the U.S. Supreme Court's decision in *Southworth,* warned the University of continuing violations of viewpoint neutrality:

1

> In the past, the (sic) some fees committee have tolerated late, inaccurate, and generally less rigorous applications from "valuable," "diverse," or "unrepresented" groups while simultaneously penalizing other groups for similarly inadequate applications… *value judgments* lie at the heart of them…by "giving a break" to a "valued" cultural group they undermine the principle of viewpoint neutrality.

R. Doc. 1-1, at 19 (Student Fees Task Force Report, Apr. 2001). Emphasis added.

The University, instead of heeding the multiple legal warnings of possible unconstitutionality, chose a decision-making process which was political, not legal. The University's response brief represents to this Court how it reached its 2010 decision to continue the 100% allocation of the 68% of the Coffman Memorial Union space to the same nine student groups. U of M Resp. Br. at 6. The 2010 decision-making process was political and completely void of critical legal analysis. *Id.* The University presents that it *surveyed* registered student groups and formed an *ad hoc* committee on the groups affected, that is, the existing nine student groups:

> The Board surveyed all registered student groups, held a series of open forums with student groups to solicit feedback on the use of space in the Union, benched marked space allocation processes at peer institutions, and formed an *ad hoc* committee on *groups affected*.

*Id.* Despite the University's claim that the ad hoc committee tried to make its decision as "objective as possible," the University chose the same nine incumbent student groups as representative of the entire campus community without critical legal analysis. *Id.* at 7.

So, after the *Southworth* decision, after the *Curry* reprieve, and after the 2001 Student Fees Task Force Report, the University chose to favor the same nine incumbent student groups despite legal warnings not to do so. In this way, the University disregarded any legal consequences of its exclusionary policy; instead, the University made a value judgment[1] to invite and retain the same nine student groups and exclude all others "semi-permanently." U of M Resp. Br. at 26 citing (R. Doc. 57, at ¶ 13):

- Al-Madinah Student Cultural Center;
- American Indian Student Cultural Center;
- MN International Student;
- Queer Student Cultural Center;
- Disabled Student Cultural Center;
- Women's Student Activist Collective;
- Black Student Union,
- Asian Student Union; and
- La Raza Student Center.

R. Doc. 1, at 19, 30 (Plts. Compl. ¶¶ 84, 155). In other words, these same nine incumbent student groups were chosen by the University in a political process which did not analyze the alleged constitutional violations.

The University acknowledges that the nine student groups were chosen for "semi-permanent" status in Coffman Memorial Union because the University

---

[1] "Value judgment" means "a statement about how good or bad you think something is, based on personal opinion rather than facts." https://dictionary.cambridge.org/us/dictionary/english/value-judgment (last visited, July 25, 2023).

3

preferred their viewpoints over other student groups. The University notes that the nine cultural groups where provided, rent free, 100% of the available 68% of the Coffman Union space "semi-permanently" "[i]n recognition of the contribution of cultural centers to the broader campus community." U of M Resp. Br. at 5.[2] So, the University, by its allocation of Coffman Memorial Union space, dramatically favors the viewpoints of these nine student groups over other student groups.

But, the viewpoints of the nine minoritized cultural centers are not any more representative of the "entire campus community" than the other student groups.[3] The University's argument that the viewpoints of the chosen nine student groups uniquely represent the campus community begs certain questions to be answered such as:

- Don't the excluded student groups make similar cultural contributions to the broader campus community?

- Why does the University semi-permanently prefer certain ethnic student groups over other ethnic student groups?

- Why does the University semi-permanently prefer Islamic worship over Jewish, Christian or other worship?

- Why does the University semi-permanently prefer the Queer Cultural Center student group over traditional-family-values student groups?

The University fails to fully explain itself on these questions. But, maybe, it is better

---

[2] This was no small "gift." Evidence reveals that cultural centers receiving approximately 1000 square feet of free rental space as cubicles were removed in the 2010s renovation that had much smaller space. *See,* R. Doc. 50–2.
[3] VPN Principal Br.

that the University hasn't explained itself because defending the constitutionally indefensible isn't necessarily pretty.

Meanwhile, the University stubbornly refuses to provide any of the 68% of Coffman Memorial Union space to other religious student groups, other ethnic student groups, traditional-family-values student groups, and other student groups who make similar cultural contributions to the campus community. And, as the University admits, its decision to favor the nine student groups to the exclusion of all other student groups was because of what the nine student groups' viewpoints uniquely contributed to the campus community: their ideology, opinion, or perspective. Each cultural center, at a minimum, engages in such viewpoint-based speech.

But, by the University choosing the nine student groups as exclusive representatives of the campus community, semi-permanently, the University's decision was based on constitutionally impermissible viewpoint discrimination. The University favors the nine student groups' ideologies, opinions, and perspectives that the University deemed necessary to its needs. *See e.g.,* U of M Resp. Br. at 8–9 (also, by reducing the number from fifteen cultural centers to nine).

The fact that any one of the nine cultural groups opposed University policies at any one time does not change this conclusion. *Id.* at 23–24. Differing opinions between parties—e.g., husband-wife, law partners, appellate court judges—is not

conclusive of any opposing rationale to why the parties originally were chosen in the first instance.

Moreover, strategic thinking by the University to promote particular student group viewpoints' controversial speech is constitutionally dubious. The University is in effect sponsoring the preferred student group viewpoints while always having plausible deniability because, according to the University, it is student-group-sponsored speech. For example, currently, the University, through its Coffman Memorial Union space allocations, sponsors the Queer Cultural Center and its controversial speech, but can plausibly deny that it sponsors the Queer Cultural Center's controversial speech because it is, according to the University, student-group-sponsored controversial speech. In this way, the University can indirectly support even controversial speech of the preferred student groups that the University wants without directly sponsoring the controversial speech because, according to the University, the preferred student group is the sponsor of the controversial speech, not the University. This type of strategic thinking by the University to use preferred student groups as a means-to-an-end to indirectly sponsor controversial speech is unconstitutional viewpoint discrimination.

The University responds that the real motivating factor was Coffman Memorial Union's renovation and limited space. Here, there was essentially no consideration by the University to open the Coffman Memorial Union to other student groups different than the nine incumbent student groups after the renovation was completed

to suit the original nine student groups. The question in 2010 was what *percentage* of the second floor of Coffman Memorial Union would be reserved for the nine cultural centers. As the University decided 68% of the second floor of Coffman Memorial Union was to be dedicated to cultural centers, the competing student groups were not considered by the University because the same nine incumbent student groups were already chosen.

Significantly, as the U.S. Supreme Court opined in *Rosenberger*, scarcity of space does not justify such viewpoint discrimination:

> [T]hat the University could discriminate based on viewpoint if demand for space exceeded its availability is wrong as well. The government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity. Had the meeting rooms in *Lamb's Chapel* [*v. Center Moriches Union Free School Dist.,* 508 U.S. 384 (1993)] been scarce, had the demand been greater than the supply, our decision would have been no different. It would have been incumbent on the State, of course, to ration or allocate the scarce resources on some acceptable neutral principle; but nothing in our decision indicated that scarcity would give the State the right to exercise viewpoint discrimination that is otherwise impermissible…

*Rosenberger v. Rector and Visitors of U. of Virginia,* 515 U.S. 819, 835 (1995). The University's decision providing preferential Coffman Memorial Union space to nine student organizations over all other student group is viewpoint discrimination. *Cf. Fisher v. U. of Texas at Austin,* 579 U.S. 365, 399–437 (2016) (Alito, J. dissenting) (race-conscious affirmative-action program was discriminatory). As the record reflects, the University preferred the historical nine student organizations over other student

7

groups that make similar cultural contributions to the University community. The University disfavors the other student groups' viewpoints because the University exclusively aligns itself with the nine student groups' viewpoints to serve the University's purposes.

The University is very much aware of student groups with differing viewpoints that also represent the campus community such as, Hillel, the Jewish student group, turned down for space in Coffman Union in 2017 or Daniel Ish-Shalom of Students Supporting Israel, denied space in 2019. R. Doc. 50–2, at 22, 39. The denials show the University's preference to align itself to the existing nine student groups' viewpoints, not for the lack of space. For instance, the University has chosen not to devise a policy or plan to rotate competing viewpoints through the cultural centers which also serve the greater campus community—although it has been recommended by litigants, critics and excluded student groups repeatedly over the decades.

The University's value judgment—ensuring only the incumbent nine student groups continue to exist at Coffman Union—is also found in the renewal process itself. Something the University failed to mention in its response brief was the super-majority vote needed to change the status of the existing nine. A renewal status cannot change from green to yellow or yellow to red without a two-thirds majority vote. R. Doc. 50-1, at 70, 76.

Finally, the University's current space renewal policy for the nine incumbent student groups perpetuates the historical constitutional wrong. The current University

policy does nothing to eliminate the original constitutional defects that continue today. The University's original decision was made prior to *Southworth,* as the University affirms, "recognizing that the 'Administration's decision to move several cultural centers into [Coffman Union] in the late 1990's (sic) was an important milestone for the University.'" *Id.* at 9. That "milestone" was to favor nine minoritized student organizations[4] to the exclusion of all others. For instance, in denying applications for Coffman Union space in 2009–10 for groups such as Collegians for a Constructive Tomorrow and Students for a Conservative Voice, with the renovation of Coffman Union, the University locked in the previous pre-*Southworth* status quo. R. Doc. 50-1, at 9 (Space Allocation Comm. Recommd. FY 09-10).

The pre-*Southworth* status quo embodying violations of viewpoint neutrality is the University's on-going policy as admitted by granting so-called "semi-permanent" status to those valued and favored nine minoritized student groups. In other words, the University's space renewal policy for the nine cultural groups merely perpetuates the wrong. The current policy does nothing to eliminate the policy's original constitutional defect that continues today. *Southworth v. Bd. of Regents of U. of Wisconsin System*, 307 F.3d 566, 594 (7th Cir. 2002) (*Southworth II).*

The U.S. Court of Appeals for the Seventh Circuit has opined on incorporating past viewpoint neutrality violations into current policies:

---

[4] "Minoritized" is how the University described the favored student organizations. R. Doc., 57-0. M. Towle Decl., Apr. 18, 2022).

9

> [U]ntil recently there were no procedures designed to assure the distribution of funds in a viewpoint-neutral manner. Thus, to the extent that the current funding decisions are based on the length of time an organization has been in existence, or the amount of funding that the RSO received in the past, the current decisions depend in part on viewpoint-based decisions of the past.

*Id.* The Seventh Circuit went on to explain that "the government 'may not discriminate in the terms of access to these facilities in favor of established parties and popular politicians....' (citation omitted). This is because the First Amendment prohibits treating speech 'in ways that favor some viewpoints or ideas at the expense of others.' *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 394 (1993) (internal citation omitted). *See also, Rosenberger* 515 U.S. at 828 ('In the realm of private speech or expression, government regulation may not favor one speaker over another.')." *Id,* 307 F.3d at 594 (7th Cir. 2002).

Here, similarly, the University has engaged and engages in viewpoint discrimination by continuing a policy to favor the viewpoints of the incumbent nine student groups over the viewpoints of other student groups. The University's current policy does nothing to eliminate the policy's past, current and ongoing unconstitutional viewpoint discrimination. Therefore, the University's current policy is unconstitutional.

## Conclusion

The district court's decision regarding the summary judgment motions should be reversed because of the University's First Amendment violations as detailed above.

10

The order granting the University of Minnesota's motion for summary judgment should be reversed. The district court order denying Appellants-Plaintiffs' motion for summary judgment should be reversed.

Dated: July 27, 2023.	/s/ Erick G. Kaardal
Erick G. Kaardal, 229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612 341-1074
Facsimile: 612-341-1076
Email: kaardal@mklaw.com
*Attorneys for the Appellants*

# CERTIFICATE OF COMPLIANCE

## WITH FED. R. APP. P. 32 (a)(7)

The undersigned certifies that the Brief submitted herein contains 2,408 words and complies with the type/volume limitations of the Federal Rules of Appellate Procedure 32(a)(7). This Brief was prepared using a proportionally spaced typeface of 14-point. The word count is stated in reliance on Microsoft Word 2016, the word processing system used to prepare this Brief.

Dated: July 27, 2023.
/s/ Erick G. Kaardal
Erick G. Kaardal, 229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612 341-1074
Facsimile: 612-341-1076
Email: kaardal@mklaw.com
*Attorneys for the Appellants*

# CERTIFICATE OF SERVICE

# FOR DOCUMENTS FILED USING CM/ECF

**Certificate of Service When All Case Participants Are CM/ECF Participants**

  I hereby certify that on July 27, 2023 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated July 27, 2023.          /s/Erick G. Kaardal
               Erick G. Kaardal, 229647
               Mohrman, Kaardal & Erickson, P.A.
               150 South 5th Street, Suite 3100
               Minneapolis, MN 55402
               Telephone: (612) 341-1074
               Email:  kaardal@mklaw.com
               *Attorneys for Appellants*